IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 14, 2009

## STATE OF TENNESSEE v. JAMES EARL McGRIGGS

**Direct Appeal from the Circuit Court for McNairy County**
**No. 2284     J. Weber McCraw, Judge**

_____

**No. W2008-02411-CCA-R3-CD  - Filed August 24, 2009**
_____

The defendant, James Earl McGriggs, was convicted of aggravated rape, aggravated kidnapping, aggravated burglary, and aggravated robbery and was sentenced, respectively, to twenty-five years, ten years, three years, and eight years. The trial court ordered that the aggravated rape sentence be served consecutively to the aggravated kidnapping sentence, with all other sentences to be served concurrently, for an effective sentence of thirty-five years. On appeal, the defendant argues that the evidence is insufficient to sustain the convictions. Following our review, we affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Chadwick G. Hunt, Savannah, Tennessee, for the appellant, James Earl McGriggs.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Bob Gray, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case resulted from the defendant's entering the residence of the elderly victim and raping and robbing her.

Investigator Roger Rickman of the Selmer Police Department testified that on November 4, 2007, at approximately 6:00 a.m., he received a call from the dispatcher saying that a home invasion had occurred on Circle Hill Drive. He proceeded to the address he was given, where he found that the locks had been broken and the doors pried open on three storage buildings located behind the house. He discovered that the telephone lines had been cut and that the screen and storm window had been removed from one of the windows of the residence. Inside the house, in the victim's

bedroom, the contents of her purse had been "poured" out and there was "bloody body fluid" on the bed.

Investigator Rickman said he spoke with a neighbor, who described a "suspicious looking" man who had ridden a bicycle in the area the day before, and realized that the description fit the defendant, with whom he was familiar. Another officer went to the residence of the defendant's sister, located on the same street as the victim's residence, where the defendant also lived and found a bicycle which did not have any dew on it, as did the other vehicles. Officers knocked on the door, and the defendant answered. He was asked to step outside, and officers were invited inside by the defendant's sister who told them that they were "welcome to look anywhere" they wanted. The defendant's sister pointed to a couch where the defendant had been sleeping. In a hole in the bottom of the couch, officers found a black handgun, a Crown Royal bag containing cash consisting mostly of one-dollar bills, jewelry, a watch, a pocketknife, some rings, and the defendant's driver's license. Officers also found underneath the couch a cell phone that was registered to the victim. The victim earlier had told officers that the money taken from her was "Sunday School money," wrapped in rubber bands, as was the money found beneath the couch.

Officers then arrested the defendant and later took a photographic lineup of him and five others to the hospital to show to the victim. She identified the defendant as the man who had raped her.

The following morning, November 5, 2007, the defendant was advised of his Miranda rights and signed a waiver of rights form. The defendant then gave a written statement which he reviewed and signed after it had been typed. Investigator Rickman then read the defendant's statement into the record:

"Yesterday morning, 11/04/2007, around 12 a.m., I was riding my bicycle on Peach Avenue and Circle Hill Drive in Selmer. I owed some people for some dope that they had fronted me to sell. I sold some on a credit and they never paid me for it. The people I owed the money to kept asking me for the money. I rode by a brick house on Circle Hill Drive twice. I didn't know who lived there. I figured it was the first of the month and they might have some money. I rode my bicycle through the woods to behind the house. I got off my bicycle and walked behind the brick house. I broke into a storage building and got a pair of hand prunes and cut the phone lines to the house. I then went into the other two buildings. I went around the house and looked at all the windows and found one on the back side of the house that was unlocked. I pulled the screen off the window, took the glass out of the storm window, pushed the inner window up. The dogs started barking and I told them to shut up and they did. I crawled through the window and went inside the house. I went through the living room looking and went to the side room and then to the old man's room. I woke the old man up and asked him where his billfold was at. He said he doesn't know and he went right to sleep. I got two watches from his room from the dresser drawer. I walked into the woman's room and saw a shoebox beside

her bed and opened it up and it had a sack of one dollar bills in it with rubber bands around it. She woke up and told me to get out of her house. I said okay. I went out the carport door and went to the edge of the woods. I went back into the house through the same door. I went back to her bedroom and asked her what, was that thing any good. I was talking about her vagina. She tried to say something and I said, "It doesn't matter." I put on a rubber and stuck my penis in her vagina. I got an orgasm and I got up. She didn't try to fight. I got up and opened the dresser drawer, took about $60.00, some rings, from it, went into the closet and got $10.00 and a cell phone from her purse. I had the gun in my pocket. I never pulled it out. I left, got on my bike and went to my sister's house on Circle Hill Drive, took a shower, laid down on the couch. I put the money and the rings and the watches in a Crown Royal sack and put it in the hole in the couch and put the pistol and cell phone in there also. The underwear with the blood on it that you got out of the bathroom was mine and also the clothes. I've had the same clothes on for a week. Signed, James McGriggs."

Jennifer Wise, a registered nurse employed at the Jackson-Madison County General Hospital, testified that she was certified as a Sexual Assault Nurse Examiner and that she examined the victim on the morning of November 4, 2007. She said that the victim was "tearful at times" and described her examination of the victim: "We swabbed inside the vagina. We also swabbed the outside of the vagina on the labia. We swabbed a bruise I believe I noticed on her arm and then we also swabbed one of her nipples where she said that he had touched with his mouth."

Wise described the injuries to the victim, in addition to a loss of blood:

There was a small laceration on the inside of her vagina near her cervix, and then on the outside, kind of like – I guess I'm going to say that this is what a vagina looks like (indicating) and then there's right at the bottom, right down there (indicating), there was a small laceration that we noted.

Special Agent Forensic Scientist Lawrence James of the Tennessee Bureau of Investigation testified about the evidence he received in the prosecution of the defendant:

There was a wipe that was used to wipe . . . the vagina of the victim. There was the victim's gown that it says it was worn during the assault, and also a gown that was worn by the victim after the assault. There was a pair of underwear from the suspect, a pair of pants from the suspect. There was an envelope with pubic hair combings, vaginal swabs and a slide that was prepared from those swabs, buccal swabs which is basically a cheek swab that's used for a DNA reference standard. There was also a swab collected from the right breast of the victim, a swab collected from the left shoulder of the victim. There were some sheets that were submitted. There was a mattress pad and comforter, and then there was a buccal swab collected from the suspect.

Agent James then related the results of his testing of the samples:

> On the vagina[l] swabs, my testing indicated that there were sperm cells on the vagina[l] swabs that I tested. Based on the analysis that I did, I got the indication that there was not a whole lot of sample there, . . . I observed very few sperm. The way that I analyze the swabs for sperm, I actually make a microscopic slide and look at it under the microscope and physically observe sperm cells. And I did on these but I saw very few there.

> I also analyzed the right breast swab from the victim for the presence of a chemical that's in saliva. It's not a confirmatory test. . . . [T]he test[] that I do is for the presence of a chemical called alpha-amylase and basically it's a chemical that breaks down starch and there's high concentration of it in saliva. However, it's also in other body fluids so it's not a particularly – it's strictly a presumptive test but the breast swabs did test positive for the presence of alpha-amylase which may indicate the presence of saliva.

> I also analyzed the left shoulder swab and I analyzed the shoulder swab for saliva and semen since I didn't know from the story exactly what was going – I didn't know why they collected the shoulder swab – and my testing failed to indicate presence of saliva or semen.

> On the vagina[l] wipe that was used . . . I did not find semen on the vagina[l] wipe.

> And, finally, I analyzed the gown . . . that was worn during the assault. I did find the presence of semen with sperm cells on the gown.

The testing of the swab of the victim's breast showed the presence of the defendant's DNA, as did samples from the victim's gown.

The victim testified that she was eighty years old and that she and her husband had lived in their home for eighteen years. She said that she was diabetic and that her husband had Alzheimer's disease and was not able to "do anything." She was awakened during the early morning hours of November 4, 2007, by a knock on the wall, which she thought was made by her husband who was sleeping in a separate bedroom. She saw a man in her room with a flashlight and thought it was her husband. She said the man then "popped up in front of [her] with a pistol in [her] face and told [her] to shut up." He removed her purse from the closet, emptied the contents on her bed, and, using his flashlight, "picked out what he wanted." She said that she had been keeping "church money," which was "folded with rubber bands around it," in a shoebox under her bed. She was awakened by the defendant's hitting the wall as he took the money, which totaled between $700 and $800. The victim said that she was treasurer of the ladies' circle at her church and that the money belonged to that

group. After the defendant left the room, she tried to use the telephone but found there was no dial tone.

The victim said that, after the defendant was "through taking everything out, what he wanted," he returned to her bedroom and unzipped his pants. The victim began crying and started begging, "Please don't do this." The defendant told her, "Shut up. Be quiet." The defendant then pulled up her gown and vaginally raped her. She said that the defendant entered her bedroom at 3:00 a.m. and that the assault lasted about five minutes. After the defendant left through the front door, the victim remained in her bed until she was certain he was not going to return. She then went into the next room and tried to awaken her husband and, after he did not understand, went to a neighbor's house and knocked on a window. He called the police, and the victim was taken by ambulance to the Jackson-Madison County General Hospital. The victim said that Jennifer Wise, the nurse who examined her, took the gown she was wearing and told her that she was "bruised all inside and had a tear," and the victim noticed that she was bleeding. Investigator Rickman showed her some photographs while she was at the hospital, and she identified one as her assailant. She identified the defendant in court as the man who raped her.

After the victim returned to her home, she saw that a screen had been removed from one of the windows and that a back door had been broken when the defendant tried to enter her attic. Also, she saw that locks were torn off two shops at the rear of her house, as well as the garage.

The defendant rested without presenting any proof.

## ANALYSIS

On appeal, the defendant argues that the proof was insufficient to support the verdicts. The State argues that the defendant has waived this issue for failure to support it with an argument or to cite to any references to the record. However, in the interest of justice, we will consider the defendant's claim.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The proof against the defendant consisted of his detailed, signed confession; items taken from the victim's house which were found underneath the couch where the defendant had been sleeping; the sample from a swab of the victim which contained the defendant's DNA; and the victim's identification of him, both from a photographic lineup and in the courtroom. We conclude that, based upon this evidence, a reasonable jury could have determined that the defendant was guilty of each of the offenses for which he was convicted.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the judgments of conviction.

_____
ALAN E. GLENN, JUDGE